# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

                                                      DECISION AND ORDER
      -v-                                               09-CR-6099 CJS

DALTON WILKE,

                            Defendant.

_____

## INTRODUCTION

The defendant, Dalton Wilke, stands accused in a four-count indictment of crimes relating to the sexual exploitation of children. In the defendant's omnibus motion, he moved to suppress any statements he purportedly made on the day of his arrest, August 8, 2008, as well as tangible property seized in connection with his arrest.

In regard to the defendant's application, a hearing was held on December 2 and 9, 2009. Detective Todd Crossett ("Crossett") of the Batavia Police Department and Special Agent Matthew Braverman ("Braverman") of the Federal Bureau of Investigation ("FBI"), as well as the defendant, testified at the hearing.

The Court, having considered the testimony presented and exhibits received into evidence at the hearing, and having made evaluations regarding credibility, makes the following findings of fact and conclusions of law.

**FINDINGS OF FACT**

Crossett is currently a detective with the Batavia Police Department, and Braverman is currently a special agent with the FBI. In August of 2008, both were involved in a child exploitation investigation regarding the defendant, Dalton Wilke. On August 8, 2008, Crossett and Braverman were present at DeWitt Park on Cedar Street in the city of Batavia when the defendant was arrested. Prior to the defendant's arrest, members of law enforcement learned that he had a New York State pistol permit for a .357 caliber handgun. At about 9:00 a.m. on August 8, 2008, after first assembling at the Batavia Police Department, about twelve to fifteen law enforcement officers in approximately five police vehicles, including Crossett and Braverman, who drove together, set up surveillance at DeWitt Park. Most of the officers were in plain clothes, although a couple of uniformed officers were present. With the exception of one Batavia Police car, all of the police vehicles were unmarked. The majority of officers present at the park wore bulletproof vests, which identified them as either "Police" or "FBI."

At about 9:03 a.m. on August 8, 2005, a red GMC pick-up truck, driven by the defendant, pulled into the parking lot of DeWitt Park and proceeded to the back of the lot before stopping. At that point, the defendant flashed his headlights in the direction of a pavilion located within the park, where a decoy officer was positioned. In that regard, Crossett, who was pretending to be a fifteen year old boy,[1] and the defendant had previously communicated on-line and a meeting had been arranged at DeWitt Park.

---

[1]Exhibit # 8, ¶¶ 10 and 15.

After flashing his lights, the defendant started to open the truck door, at which time Braverman called out the signal to arrest him. Upon receiving Braverman's signal, police personnel converged on the defendant's vehicle. The defendant was ordered out of his truck, and he exited with his hands raised. At the time the defendant was arrested, many of the officers involved had their guns drawn. The defendant was handcuffed behind his back, searched to make sure that he did not have any weapons, and placed into an FBI vehicle with Braverman and another FBI special agent, Michael Shaver ("Shaver"). Braverman and Shaver identified themselves and told the defendant that he was being transported to the Batavia Police Department. During the drive to the Batavia Police Department, which took about five minutes, Braverman and Shaver did not have any conversation with the defendant

Upon arriving at the Batavia Police Department, the defendant was taken into what is referred to as the victims' room. The room was utilized for victims of domestic violence, as well as for suspects, like the defendant, who were not causing a problem and who had not been involved in violent crimes. Approximately seven to ten minutes elapsed from the time the defendant was arrested until he was placed into the victim's room. Crossett was already present at the Batavia Police Department when Braverman, Shaver, and the defendant arrived, and it was Crossett who directed Braverman, Shaver, and the defendant to the victims' room.

Crossett and Braverman accompanied the defendant into the victims' room, which is fairly depicted in Exhibits ## 2-A, 2-B, 2-C, and 2-D in evidence. Once inside, after asking the defendant if he was going to be any sort of trouble, Braverman removed the defendant's handcuffs. Crossett then asked the defendant if he wanted anything to eat or

drink or if he needed to use the restroom. In response, the defendant asked for water, and Crossett got him a bottle of water. The defendant took a seat on a chair located directly in front of the fireplace in the victims' room. Braverman sat on the couch inside the room, and Crossett pulled up a desk chair, so that he was closer to Braverman. Both Braverman and Crossett had removed the bullet-proof vests each had been wearing at the time the defendant was arrested. Further, while both Braverman's and Crossett's holstered weapons were visible in the victims' room, neither Braverman nor Crossett ever drew his weapon.

After the defendant's handcuffs were removed and he was provided with water, Braverman asked the defendant if he had any trouble understanding him, to which the defendant replied that he did not. Braverman also asked the defendant if he could read and write, and the defendant replied "yes." Braverman further asked the defendant his educational level, and the defendant responded that he had completed high school. Braverman next proceeded to advise the defendant of his *Miranda*[2] warnings, using a waiver form, Exhibit # 3, in evidence. Braverman first showed the defendant the form and asked him if he had any problems reading the words, and the defendant replied "no." Braverman then read the defendant his *Miranda* warnings exactly as they appear on Exhibit # 3. After doing so, Braverman asked the defendant if he had any questions, to which the defendant responded "no," adding he was only going to answer questions until he was no longer comfortable doing so. The defendant then signed the Exhibit # 3 immediately under the following two sentences: "I have read this statement of my rights

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

and I understand what my rights are. At this time, I am willing to answer questions without a lawyer." Crossett and Braverman then signed the form as well, witnessing the defendant's signature. As indicated on Exhibit # 3, Braverman started advising the defendant of his rights at 9:24 a.m. and the defendant signed the form, acknowledging that he understood his rights and agreed to waive them and speak to the Braverman and Crossett, at 9:25 a.m. After the defendant signed the rights form, Braverman and Crossett proceed to interview him, although Braverman did the majority of the questioning. While the defendant appeared somewhat nervous, he was fairly calm and not overly agitated. He never cried, never raised his voice, nor was he sweating or shaking. The interview was conducted by question and answer. The defendant responded to the questions asked, and his responses were coherent.

The defendant informed Braverman and Crossett that he was an IT administrator for the Automobile Club of America. As such, he was in charge of the telecommunications and computer-related infrastructure for the organization and had approximately twenty subordinates reporting to him. The defendant was asked by Braverman and Crossett why he came to the park in Batavia that morning, to which he responded to meet a friend, whom he had met on-line, and go fishing. The defendant said the friend was an eighteen year old male. When asked why there was no fishing gear in his car, the defendant replied that his friend was supposed to bring all of the fishing gear. The defendant was also asked why he was going fishing on a day when it was raining fairly hard and he could not really answer that question. At that point, Braverman and Crossett left the victims' room because they thought the defendant was not being truthful, and Shaver came in to watch the defendant.

Outside of the victims' room, Braverman and Crossett discussed showing the defendant some of the computer chats in which he had been involved in the course of the investigation and which had been printed out. They then went back inside the victims' room, told the defendant that they didn't believe him, and explained to him that they were in possession of on-line chats, in which they believed he was a participant, and that the chats involved discussions of a sexual nature with a purportedly fifteen year old boy. They proceeded to show the chats to the defendant and gave him the opportunity to read them. Braverman and Crossett also pointed out that, in the chats, the participant, with whom the defendant was communicating, indicated several times that he was fifteen and that there was discussion about meeting that morning to have sex–not to go fishing. Upon being confronted with the chats, the defendant admitted that he was aware that the male had said that he was fifteen, although he thought that in some other chats the male had said that he was eighteen. Braverman gave the defendant the opportunity to show him the chats in which the male said he was eighteen, but the defendant declined to do so. Braverman asked the defendant to sign the chats, acknowledging that he was a party to the conversations. However, the defendant again declined to do so, indicating that he did not want to sign, and said "you have me, you have all the evidence you need."

As the interview continued, the defendant acknowledged that the screen name, "lakeboi35," used in the chats was his and that he also used Yahoo messenger to chat under a different screen name. During the interview, the defendant further indicated that he brought a web cam to give to the person he was meeting in the park. The defendant also related to Braverman and Crossett that he used his work laptop computer for all of the chats, and that he engaged in almost all the chats from home.

At that time in the interview, Braverman asked the defendant for permission to go into his residence and search for the laptop. The defendant responded that would be fine, and Braverman told him that, with respect to the laptop, a consent to search form would be needed. Braverman started to complete the form, and as he was doing so, the defendant indicated that his two young daughters were home alone, and that, since his house was going to be searched, he asked if he could, at some time, notify his daughters or contact his wife to notify them. Braverman and Crossett agreed to the defendant's request, and told the defendant that he could call his wife or his daughters once the interview was completed. Subsequently, Braverman presented the defendant with the "Consent to Search" form, introduced into evidence as Exhibit # 4, to review and sign. Braverman also presented the defendant with a "Consent to Search Computer(s)" form, introduced into evidence as Exhibit # 5, as well as a "Consent to Assume Online Presence" form, introduced into evidence as Exhibit # 6.

With respect to Exhibits ## 4, 5 and 6 Braverman placed each form, in turn, in front of the defendant, and gave him time to read and review each and to determine if he had any questions. Prior to providing the defendant Exhibit # 4, Braverman hand printed the places and things to be searched: "-My residence at 5860 West Lake Road, Conesus, New York; -All vehicles present at 5860 West Lake Road, Conesus, New York; -GMC Sierra 2004." Prior to presenting the defendant Exhibit # 5, Braverman hand printed the defendant's name, "Dalton Wilke," the computer to be searched, "Hewlett Packard Laptop," the location of the computer, "5860 West Lake Road, Conesus, New York," and the required passwords, "Username: dwilke, pw: Buffalo002," which the defendant provided. Prior to presenting the defendant Exhibit # 6, Braverman hand printed the defendant's

name, "Dalton Wilke," the individuals to whom authorization to assume the online presence was being given, "SA Matthew I. Braverman and other FBI personnel," the account, "Lakeboi35 (AIM)," password "ilmj " and the account Brian-W-1988 (Yahoo password "ilmj"). The defendant provided the account information and passwords. Exhibits ## 4, 5 and 6 each contain language to the effect that the defendant had the right to refuse consent, and Braverman advised the defendant as to each that he did not need to give his consent. As to Exhibits ## 4, 5 and 6 the defendant gave his consent, signing each form. Neither Braverman nor Crossett ever threatened the defendant in any way to obtain his consent. It took about ten to fifteen minutes to present the defendant with the three consent forms, Exhibits ## 4,5, and 6,  and for the defendant to sign them.

After the defendant signed Exhibits ## 4, 5 and 6, Braverman asked him if he would be willing to sign a written summary of their conversation that morning, if,  after reviewing the statement, he agreed with it. The defendant indicated that was agreeable to him. Exhibit # 7, in evidence, is the statement hand printed by Braverman relating to the interview of the defendant after he was confronted with the chats. After preparing Exhibit # 7, Braverman presented it to the defendant to read, and observed the defendant in fact reading it. Once the defendant finished reading Exhibit # 7, he commented on the following sentence included in the statement: "I traveled to the park for the possibility of having sex with a fifteen year old male." Specifically, the defendant indicated that he did not know if he was going to have sex with the male at the park, that they had discussed it, but it wasn't a final plan. Braverman responded that it would be no problem to change the sentence, but noted that it only states the possibility of having sex and it doesn't say that the defendant was going to the park for absolutely no other reason than to have sex with a fifteen year

old boy. After Braverman provided the him with this explanation, the defendant did not request or make any changes, and he agreed to sign the statement, which he did in the presence of Braverman and Crossett, who witnessed his signature.

After the defendant signed the statement and Braverman and Crossett witnessed it, Braverman discussed with him the possibility of writing a letter of apology to the individual whom he was supposed to meet. The defendant responded that he wanted to, but didn't feel that he was in the right mindset to do so, since he was overwhelmed and it had been a long day, and he did not write such letter.

At that point, at approximately 11:00 a.m., the interview of the defendant was completed. Upon the conclusion of the interview, the defendant was offered and accepted another bottle of water.

During the course of the interview, neither Braverman nor Crossett ever made the defendant any promises to get him to speak with the police. The only promise made to the defendant was Braverman's commitment to him, in connection with the consent to search 5860 West Lake Road, that he would be allowed to contact his wife or daughters at the completion of the interview. Moreover, neither Braverman nor Crossett ever threatened the defendant in any way or exerted physical force against him to get him to speak with them. Additionally, the defendant was twice provided with water upon his request. Finally, at no time, from the time he was arrested at Dewitt Park through the time he was with Braverman and Crossett, did the defendant ever ask for an attorney or indicate that he did not want to talk to the police.

About ten to fifteen minutes after the completion of the interview, the defendant's cell phone, which had been taken into custody was returned to him, so that, as promised

by Braverman, he could try to contact his wife or children, alerting them to the fact that the police were going to search their residence. The defendant first tried to call his wife, but was unable to reach her. He then called his residence and spoke with his eldest daughter. He told her that some men were coming to the house, because they needed access to his office, and to let them in, put the dogs in another room and not to be scared, that it was fine. That call lasted about twenty seconds. The defendant made one final call to a business associate advising him that he would not be able to make a previously scheduled appointment. Subsequently, the defendant was again handcuffed, escorted from the victims' room, and transported to the Federal Building in Rochester.

At approximately 12:05 p.m. on August 8, 2008, pursuant to the Consent to Search, Exhibit # 4, that the defendant had signed, a search was conducted of his residence at 5860 West Lake Road, Conesus, New York. The day before, August 7, 2008, Braverman had completed and sent to the United States Attorney's Office an affidavit in support of an application for a federal search warrant for 5860 West Lake Road. Received into evidence as Exhibit # 8 were the application and affidavit of Braverman, which he signed on August 8, 2008. Based upon Exhibit # 8, United States Magistrate Judge Marian Payson signed a search warrant on August 8, 2008 at 2:15 p.m., received into evidence as Exhibit # 9, which authorized the search of 5860 West Lake Road, Conesus, New York. The affidavit completed by Braverman on August 7, 2008, is identical to the affidavit submitted to Judge Payson on August 8, 2008, with the exception of the addition of her name and some alteration in numbering. The items seized pursuant to the Consent to Search, Exhibit # 4, are the same items authorized for seizure by the warrant signed by Judge Payson.

**CONCLUSIONS OF LAW**

A.    Statements of the Defendant

The Government maintains any statements the defendant made to Braverman and Crossett on August 8, 2008, were acquired in accordance with the defendant's constitutional rights. However, the defendant seeks suppression of any statements he made to Braverman and Crossett:

> 6. Due to the improper conduct on the part of law enforcement officials, the alleged statements were taken either without adequately advising the defendant of his *Miranda* rights prior to questioning, in the absence of a knowing, voluntary, or intelligent waiver by the defendant of his rights prior to questioning, or otherwise in violation of defendant's constitutional rights.
>
> 7. Further, upon information and belief, such statements were also seized in violation of the Fourth Amendment of the United States Constitution and Constitution and laws of this Connecticut [sic] and must therefore be suppressed (*Dunaway v. New York*, 442 U.S. 200 [1979]; *Wong Sun v. United States,* 371 U.S. 471 [1963]; *Mapp v. Ohio*, 367 U.S. 643 [1961]).

(Defendant's Notice of Motion, October 14, 2009, at 4.)

It is, of course, without dispute that probable cause to arrest is required for the police to conduct a custodial interrogation. In that regard,  probable cause to arrest "exists when the law enforcement officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient in themselves to warrant a person of reasonable caution in the belief that (1) an offense has been or is being committed (2) by the person to be arrested." *United States v. Fisher*, 702 F.2d 372, 375 (2d Cir. 1983).

Additionally, it is  well settled that the Government may not use any statements obtained from a defendant, whether exculpatory or inculpatory, which were the product of custodial interrogation, unless prior to any questioning the defendant was advised of his

constitutional rights and knowingly, intelligently and voluntarily waived such rights. *Miranda v. Arizona*, 384 U.S. 436 (1966); *Colorado v. Spring*, 479 U.S. 564 (1987); *Edwards v. Arizona*, 451 U.S. 477 (1981). That is, the Government bears the burden of proving by a preponderance of the evidence both that a defendant was advised of his constitutional rights guaranteed under *Miranda* and that he knowingly, intelligently and voluntarily waived his rights. *Lego v. Twomey*, 404 U.S. 477, 482-89 (1972).

Moreover, it is well settled that the statements of a defendant themselves must be voluntary based on the "totality of the circumstances." *Miller v. Fenton*, 474 U.S. 104, 112 (1985). In that regard, the burden is on the Government to prove that a confession is voluntary by a preponderance of the evidence. *Colorado v. Connelly*, 479 U.S. 157, 168 (1986). A statement is not voluntary if it is obtained by any type of physical or psychological coercion or by improper inducement so that a defendant's will was overborne. *Hayes v. State of Washington*, 373 U.S. 503, 513-14 (1963). In other words, a confession is "involuntary" if it is obtained by "'techniques and methods offensive to due process' or under circumstances in which the suspect clearly had no opportunity to exercise 'a free and unconstrained will.'" *Oregon v. Elstad*, 470 U.S. 298, 304 (1985) (quoting *Haynes v. Washington*, 373 U.S. 503, 515 (1963)). "No single criterion controls whether an accused's confession is voluntary: whether a confession was obtained by coercion is determined only after careful evaluation of the totality of the surrounding circumstances." *Green v. Scully*, 850 F.2d 894, 901 (2d Cir.1988). The totality of the surrounding circumstances are evaluated "to determine whether the government agents conduct 'was such as to overbear [a defendant's] will to resist and bring about confessions not freely self-determined.'" *United States v. Kaba*, 999 F.2d 47, 51 (2d Cir.1993) (quoting *United States v. Guarno*,

819 F.2d 28, 30 (2d Cir. 1987)). "The factors to be considered include 'the type and length of questioning, the defendant's physical and mental capabilities, and the government's method of interrogation.'" *United States v. Alvarado*, 882 F.2d 645, 649 (2d Cir. 1989) (quoting *United States v. Mast*, 735 F.2d 745, 749 (2d Cir.1984)).

Based upon the above-stated principles of law and its findings of fact, the Court concludes that statements, both oral and written, made by the defendant to Braverman and Crossett, are admissible. More specifically, the Court finds that the Government has established by a preponderance of evidence that prior to any questioning, the defendant was advised of his constitutional rights as guaranteed by the *Miranda* decision and knowingly, intelligently, and voluntarily waived his rights and agreed to speak to Braverman and Crossett.

First, in reaching its determination as to the defendant's *Miranda* warnings, the Court relies on several facts as detailed above. After the defendant's handcuffs were removed and he was provided with water, Braverman asked the defendant if he had any trouble understanding him, to which the defendant replied that he did not. Braverman also asked the defendant if he could read and write, and the defendant replied "yes." Braverman further asked the defendant his educational level, and the defendant responded that he had completed high school, and at the time of the advisement, the defendant was employed as an IT administrator for the Automobile Club of America, where he was in charge of the telecommunications and computer-related infrastructure with approximately twenty subordinates reporting to him. Braverman then advised the defendant of his *Miranda* rights by reading them exactly as they appear on Exhibit # 3. However, before doing so, Braverman first showed the defendant the form and asked him

if he had any problems reading the words, to which the defendant replied no.  After reading the defendant his constitutional rights, Braverman asked the defendant if he had any questions, to which the defendant responded "no," adding he was only going to answer questions until he was no longer comfortable doing so. The defendant then signed Exhibit # 3, immediately under the following two sentences: "I have read this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer."  Crossett and Braverman then signed the form. At no time during the interview did the defendant ever indicate that he wanted an attorney or that he no longer wished to speak with Braverman and Crossett.

Second, as to its determination on voluntariness, the Court again relies on its findings of fact. The defendant was interviewed in the victims' room at the Batavia Police Department. As can be seen from Exhibits ## 2-A, 2-B, 2-C and 2-D, this room provided a comfortable, non-threatening setting. The room contained a couch, sofa chair, another padded chair, a coffee table, television, lamps and fireplace. Although he declined, at the start of the interview, the defendant was given the opportunity to go to the bathroom and did accept a bottle of water. He was not handcuffed during the interview, which was conducted in the morning and lasted only from 9:25 a.m. to approximately 11:00 a.m. on June 8, 2008. Prior to the interview, the defendant had been able to drive his vehicle to DeWitt Park in Batavia, New York. The defendant was asked questions by Braverman and Crossett, which he never indicated he could not understand, and to which he responded in a coherent fashion. Neither Braverman nor Crossett ever used physical force or the threat of physical force against the defendant to get him to speak, nor did either make any other type of threats to get the defendant to talk to them. The defendant in fact made clear

to Braverman and Crossett that he was only going to answer questions until he was no longer comfortable doing so. Moreover, twice during the interview the defendant refused a suggestion by Braverman and Crossett. The defendant refused to sign the chats, and he declined to write a letter of apology. Furthermore, neither Braverman nor Crossett ever made the defendant any promises to get him to speak with the police. The only promise made to the defendant was Braverman's commitment to him, in connection with the consent to search 5860 West Lake Road, that he would be allowed to contact his wife or daughters at the completion of the interview, which did in fact occur. Lastly, at no time did the defendant ever indicate that he did not want to speak with Braverman or Crossett or that he wanted a lawyer. Accordingly, the preponderance of evidence establishes that the statements made to Braverman and Crossett were not the result of any physical or psychological coercion or by the exertion of any type of improper influence, but rather were voluntarily made.

B.      Tangible Evidence

The defendant seeks to suppress "all computers, electronic media, and other property seized during a search of his residence on August 8, 2008." (Defendant's Notice of Motion, October 14, 2009, at 5.) In that regard,

> 16. Defendant contends that this consent to search form was not, under the totality of the circumstances – executed while the defendant, who was not accustomed to dealing with police, was in custody (for the first time in his life) at the Batavia Police Department, had been Mirandized and interrogated – executed voluntarily as the result of "an essentially free and unrestrained choice" (*Schneckloth v. Bustamonte*, 412 U.S. 218 [1973]).

(*Id.* at 6.) The Government, though, maintains that the items in question were lawfully seized based upon the defendant's voluntary consent.  Alternatively, the Government

argues that, even if the Court should determine that it has failed to establish voluntary consent, the property, to which the defendant objects, would be admissible under the doctrine of inevitable discovery.

1.    Consent to search

The general rule is that all warrantless searches, even when based on probable cause, are "per se unreasonable under the Fourth Amendment–subject only to a few specifically established and well delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967). One such exception would be a consent search. *United States v. Kon Yu-Leung*, 910 F.2d 33, 40-41 (2d Cir. 1990). The Government, of course, bears the burden of establishing by a preponderance of evidence that consent was voluntarily given. *United States v. Buettner-Januscch*, 646 F.2d 759, 764 (2d Cir. 1981). To be voluntary, means that the consent was obtained without coercion. *Schneckloth v. Bustamonte*, 412 U.S. 218, 228 (1973). In that regard, voluntariness is determined based upon the totality of circumstances, with a view as to whether consent was the product of free choice rather than merely an acquiescence to authority. *Id*. at 226; *United States v. Wilson*, 11 F. 3d 346, 351 (2d Cir. 1993); *United States v. $19,047.00 in U.S. Currency*, 95 F.3d 248, 252 (2d Cir. 1996). As to the validity of a consent search, the Second Circuit has offered the following guidance:

> It is by now well established that while a warrantless search of a home is generally unreasonable and therefore violates the Fourth Amendment, which proscribes "unreasonable searches," an individual may consent to a search, thereby rendering it reasonable. *See United States v. Kon Yu-Leung*, 910 F.2d 33, 40-41 (2d Cir. 1990) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 226-27, 93 S.Ct. 2041, 2043-44, 2047-48, 36 L.Ed.2d 854 (1973)); see also *United States v. Wilson*, 11 F.3d 346, 351 (2d Cir. 1993), *cert. denied*, 511 U.S. 1025, ----, ----, 114 S.Ct. 1415, 1563, 2142, 128 L.Ed.2d 86, 209, 870 (1994). To ascertain whether consent is valid, courts examine

the "'totality of all the circumstances'" to determine whether the consent was "a product of that individual's free and unconstrained choice, rather than a mere acquiescence in a show of authority." *Wilson*, 11 F.3d at 351 (quoting *Schneckloth*, 412 U.S. at 227, 93 S.Ct. at 2048; other citations omitted); *see also Yu-Leung*, 910 F.2d at 41.

*United States. v. Garcia*,  56 F.3d 418, 422 (2d Cir. 1995).

It is also well established that the concept of knowing and intelligent waiver, which is strictly applied to rights involving a fair criminal trial, does not govern in the Fourth Amendment context. *Schneckloth*, 412 U.S. at 241-42 (explicating "vast difference between those rights that protect a fair criminal trial and the rights guaranteed under the Fourth Amendment"); *Illinois v. Rodriguez*, 497 U.S. 177, 183 (1990). This is so because the Fourth Amendment prohibits not all searches and seizures, but only those that are "unreasonable." *Id.* at 183. So long as the police do not coerce consent, a search conducted on the basis of consent is not an unreasonable search. *Schneckloth*, 412 U.S. at 228. Therefore, knowledge of the right to refuse consent is not a requirement to a finding of voluntariness, *Id.* at 231-33,  although it may be a factor in ascertaining whether the consent was coerced. *Id*. at 248-49; *United States v. Yu-Leung*, 910 F.2d at 41.

Recent Supreme Court decisions emphasize both that only unreasonable searches are proscribed by the Fourth Amendment, and that the issue of reasonableness is to be measured by an objective standard. *United States v. Garcia*, 56 F.3d at 422-23 (2d Cir. 1995).

Based upon these applicable principles of law and its findings of fact, the Court concludes that the Government has established by a preponderance of evidence that the defendant's consent to allow law enforcement to search his residence at 5680 West Lake Road, Conesus, New York (Exhibit # 4), his consent to allow law enforcement to search

the Hewlett Packard laptop (Exhibit # 5), and his consent to allow law enforcement to assume his online presence (Exhibit # 6) were all voluntary. In reaching its conclusion, the Court considers the totality of circumstances. First, as of August 8, 2008, the defendant was forty-four years old. Second, at the time he gave the consents, he was in the comfortable setting of the victims' room, his handcuffs had been removed, and he had been offered and accepted a bottle of water. Third, he indicated that he had no trouble understanding Braverman and Crossett. Fourth, prior to giving the consents, he had been advised of his *Miranda* rights and explicitly waived his rights. Fifth, the defendant was a high school graduate, who was employed as an IT administrator for the Automobile Club of America, where he was in charge of the telecommunications and computer-related infrastructure for the organization and had approximately twenty subordinates reporting to him. Sixth, the defendant had been alerted to the nature of the investigation, and had, in fact, been given the opportunity to examine the chats maintained in connection with the investigation. Seventh, Braverman told the defendant that he did not have to give consent. Eighth, Exhibits ## 4, 5 and 6, contained language to the effect that, although the defendant had been advised of his right to refuse consent, he was voluntarily giving permission to search and seize, or, in the case of Exhibit # 6, assume his online presence. Ninth, while Braverman was completing Exhibit # 4, the defendant indicated that his two young daughters were home alone, and that, since his house was going to be searched, he questioned whether he could, at some point, notify his daughters or contact his wife of the impending search, to which Braverman and Crossett agreed, telling the defendant that he could call his wife or his daughters once the interview was completed. Tenth, the defendant had the presence of mind and wherewithal, during the course of the interview

process, to refuse to sign the chats when asked by Braverman to do so, and to decline to write a letter of apology when invited by Braverman to do so. Finally, neither Braverman nor Crossett threatened the defendant in any way to get him to sign Exhibits ## 4, 5 or 6.

2.    Inevitable Discovery

With respect to the application of inevitable discovery based upon a subsequently obtainable search warrant, this Circuit has explained:

> We have previously indicated that the government cannot prevail under the inevitable discovery doctrine merely by establishing that it is more probable than not that the disputed evidence would have been obtained without the constitutional violation. [FN6] *See United States v. Cabassa*, 62 F.3d 470, 472-73 (2d Cir. 1995). On the contrary, we held in *Cabassa* that proving that a judge could validly have issued a warrant supported by probable cause was not necessarily enough to establish that a judge would have issued the warrant in question. *See id.* at 474. In that case, agents from the Drug Enforcement Agency ("DEA") entered the defendant's home and seized controlled substances, weapons, and money, all without a warrant. *See id.* at 472. At the time of the search, other DEA agents were in the process of requesting, but had not obtained, a warrant from a magistrate judge. *Id.* Rejecting the district court's conclusion that the contraband would inevitably have been found because a warrant would surely have been issued, we suppressed the illegally-acquired evidence on the grounds that the magistrate judge might not have granted a warrant to conduct the search. We did so even though we conceded that the district court might well have been correct that the "government's draft affidavit demonstrated probable cause" to support the issuance of a warrant. *See id.* at 473. But, because there was "some room for disagreement," we found "a residual possibility that a magistrate judge would have required a stronger showing of probable cause" before authorizing the search and seizure. *Id.* at 473-74. Since this eventuality could not be resolved in the government's favor, we declared the evidence inadmissible. *Id*.
>
> > FN6. This requirement of certitude should not be confused with the government's burden of proof, which, it is well settled, requires that inevitable discovery be established by a preponderance of the evidence. See *Nix*, 467 U.S. at 444, 104 S.Ct. 2501 ("If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means ... then the deterrence rationale has so little basis that the

evidence should be received." (emphasis added)); *see also United States v. Cunningham*, 413 F.3d 1199, 1203 (10th Cir. 2005) ("The government possesses the burden of proving by a preponderance of the evidence that the evidence at issue would have been discovered without the Fourth Amendment violation.").

In adopting this standard, we have acknowledged, but have failed to resolve, the paradox of applying the preponderance of the evidence standard in the context of inevitable discovery: "There are, of course, semantic problems in using the preponderance of the evidence standard to prove inevitability.... Given the present facts, we need not probe further into the semantic puzzle other than to note the difference between proving by a preponderance that something would have happened and proving by a preponderance that something would inevitably have happened." *United States v. Cabassa,* 62 F.3d 470, 474 (2d Cir.1995) (emphasis added). Because further clarification is not needed to resolve the case before us, we leave to another day the task of ironing out this wrinkle in the doctrine.

Our decision in *Cabassa* established that evidence minimally sufficient to support probable cause would not always be enough to demonstrate that a governmental actor vested with discretion–*e.g.*, a magistrate judge asked to issue a warrant–would act on that evidence. [FN7] On the basis of *Cabassa*, district courts in our circuit have held that the inevitable discovery exception to the exclusionary rule is available only where a court has a "high level of confidence" that "each of the contingencies" needed to obtain the evidence legally would be resolved in the government's favor:

> FN7. In *Cabassa*, we distinguished an earlier inevitable discovery case, *United States v. Whitehorn*, 829 F.2d 1225 (2d Cir.1987), on the grounds that, in *Whitehorn*, there had been "'overwhelming' probable cause to support the warrant application," which strengthened the government's contention in that case that the issuance of a valid warrant was, under the circumstances, truly inevitable. *See Cabassa*, 62 F.3d at 473 (emphasis added). Accordingly, at least with respect to a judge's decision to issue a warrant, Cabassa could be read to require "overwhelming probable cause" to demonstrate inevitable discovery. **Cabassa's reasoning, however, only establishes that (absent indications to the contrary) overwhelming probable cause is sufficient to find inevitable discovery, not that it is necessary to reach such a conclusion.**

The teaching of *Cabassa,* which is supported by principles of probability, thus is straightforward. It suggests that a trial court's task in [the] context [of inevitable discovery] is to deny the motion to suppress on the ground of inevitable discovery only if it has a high level of confidence that the warrant in fact would have issued and that the specific evidence in question would have been obtained by lawful means. Inevitable discovery analysis therefore requires a court to examine each of the contingencies that would have had to have been resolved favorably to the government in order for the evidence to have been discovered legally and to assess the probability of that having occurred. *United States v. Lavan,* 10 F. Supp. 2d 377, 389 (S.D.N.Y. 1998) (Kaplan, J.) (emphasis added); *see also United States v. Arms*, 2002 WL 32781 *5 (E.D.N.Y.2002) (Block, J.) (finding that discovery of the evidence was inevitable when there is "no question that a warrant would in fact have issued").

The Tenth Circuit has similarly required substantial certainty with respect to each of the contingencies involved in the causal chain of inevitability posited by the government. See *United States v. Cunningham*, 413 F.3d 1199, 1203 (10th Cir. 2005) ("[W]e held it permissible for a court to apply the inevitable discovery doctrine when it has a high level of confidence that the warrant in fact would have been issued and that the specific evidence in question would have been obtained by lawful means. Inevitable discovery analysis thus requires the court to examine each of the contingencies involved that would have had to have been resolved favorably to the government in order for the evidence to have been discovered legally and to assess the probability of the contingencies having occurred." (internal quotation marks and citation omitted)). *See also United States v. Romero*, 692 F.2d 699, 704 (10th Cir. 1982) ("Under the inevitable discovery exception, unlawfully seized evidence is admissible if there is no doubt that the police would have lawfully discovered the evidence later." (emphasis added)).

In contrast, other circuits have required only that there be a "reasonable probability that the contested evidence would have been discovered by lawful means in the absence of the police misconduct." *United States v. Chambers*, 132 Fed.Appx. 25, 33 (5th Cir. 2005); *see also Jefferson v. Fountain*, 382 F.3d 1286, 1296 (11th Cir. 2004); *United States v. James*, 353 F.3d 606, 617 (8th Cir. 2003); *United States v. Kennedy*, 61 F.3d 494, 499 (6th Cir. 1995); *United States v. Thomas*, 955 F.2d 207, 210 (4th Cir. 1992). And before our decision in *Cabassa,* two district courts of this circuit also used the "reasonable probability" threshold. *See United States v. Yanes*, 671 F. Supp. 927, 933 (D.Conn. 1987) (Dorsey, J.); *United States v. Levasseur*, 620 F.Supp. 624, 631 (S.D.N.Y. 1985) (Glasser, J.).

To the extent that any confusion lingers in our circuit after *Cabassa*, we now expressly eschew the "reasonable probability" framework that some of our

sister circuits have used to analyze "inevitable discovery" cases. In its place--and consonant with the "teachings of *Cabassa*," with the Tenth Circuit's methodology in *Cunningham*, and with the approach most recently taken by our district courts–we conclude that illegally-obtained evidence will be admissible under the inevitable discovery exception to the exclusionary rule only where a court can find, with a high level of confidence, that each of the contingencies necessary to the legal discovery of the contested evidence would be resolved in the government's favor.

*United States v. Heath*,  455 F.3d 52, 58 -60 (2d Cir. 2006) (emphasis added). Here a search warrant, Exhibit # 9, for 5860 West Lake Road, Conesus, New York, authorizing seizure of the items in  question, actually issued. Moreover, the affidavit in support of the warrant,  Exhibit # 8, signed by Braverman before Judge Payson on August 8, 2008, details only information of which he was in possession on August 7, 2008. An examination of the affidavit leads to the inescapable conclusion that the warrant was supported by overwhelming probable cause unrelated to anything the police discovered inside 5860 West Lake Road prior to its issuance. Consequently, the Court finds by a preponderance of evidence that the doctrine of inevitable discovery applies. *Id.*

## CONCLUSION

Accordingly, the defendant's applications (Docket # 24 & 27) to suppress physical evidence and statements is denied.

IT IS SO ORDERED.

DATED:      January 19, 2010
                 Rochester, New York        ENTER.


                                            /s/ Charles J. Siragusa_____
                                            CHARLES J. SIRAGUSA
                                            United States District Court Judge